UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROBERT W. WALP, ) | CASE NO. 4:18CV897 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE PAMELA A. BARKER |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| ANDREW M. SAUL[1], ) | |
| COMMISSIONER OF SOCIAL ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, ) | OF MAGISTRATE JUDGE |
| ) | |
| Defendant. ) | |

Plaintiff Robert W. Walp ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred by: (1) determining that he had marked and not extreme limitations in interacting with others; and (2) determining that he had the mental residual functional capacity ("MRFC") to occasionally and superficially interact with co-workers. ECF Dkt. #11. For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

**I.   FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on October 7, 2014 alleging disability beginning June 30, 2014 due to bipolar disorder, depression, mood disorder, explosive disorder, and chronic headaches. ECF Dkt. #10 ("Tr.") at 85, 230, 262.[2] The Social Security Administration ("SSA") denied his applications initially and upon reconsideration. *Id.* at 155-160, 163-175. Plaintiff

---

[1] On June 17, 2019, Andrew M. Saul became the Commissioner of the Social Security Administration ("SSA"), replacing Nancy A. Berryhill, who was the acting Commissioner of Social Security.

[2] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

requested a hearing before an ALJ, and the ALJ held a hearing on May 17, 2017, where Plaintiff was represented by counsel and testified. *Id*. at 60, 176. A vocational expert ("VE") also testified. *Id.*

On June 16, 2017, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Tr. at 11-21. Plaintiff appealed that determination to the Appeals Council and the Appeals Council denied his request for review on February 16, 2018. *Id*. at 1-4.

On April 19, 2018, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. He filed a merits brief on August 2, 2018 and Defendant filed a merits brief on October 18, 2018. ECF Dkt. #s 11, 15. Plaintiff did not file a reply brief.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     RELEVANT MEDICAL EVIDENCE

Since Plaintiff's allegations of error concern only findings and limitations relating to his mental impairments, the undersigned will discuss the medical evidence relating only to those impairments.

As background, the record medical evidence shows that on June 2, 2009, Plaintiff presented to the emergency room for right hand pain after he struck a car hood with his fist. Tr. at 364. A puncture wound was noted on his right fifth digit and he was diagnosed with a hand contusion and hand injury. *Id*. at 368.

On November 1, 2009, Plaintiff arrived by ambulance to the emergency room after cutting his left forearm upon learning that his wife of 10 years was gay and she was leaving him for a woman. Tr. at 338. When asked why he cut himself, Plaintiff stated that he was trying to make a point. *Id.* When he was told that he had to undergo a psychiatric evaluation because of the cuts, he stated that he was not trying to kill himself, but maybe he should have killed his wife. *Id.* Plaintiff was described as agitated, anxious, and angry about his marriage. *Id.* He was discharged with a depression diagnosis, prescribed Keflex, and he was referred to Valley Counseling. *Id*. at 345.

The medical evidence of Plaintiff's mental impairments relevant to the instant case shows that on September 21, 2014, Plaintiff underwent an initial psychiatric evaluation with a nurse practitioner. Tr. at 395-398. His mental status evaluation showed that he had intense eye contact,

-2-

he was agitated, had racing thought process, rapid speech, and he was depressed and angry, but he had fair insight and judgment. *Id.* Plaintiff reported that he was aggressive as a child, but it was never a problem until 2009 when his father, who had raised him when his parents divorced, died. *Id.* at 395. He stated that he was not able to do MMA and boxing since then due to his aggression and he had been losing jobs due to his anger. *Id.* He also indicated that because he was losing employment, the financial constraints caused arguments with his girlfriend and he would break things in his home and he had recently shook his girlfriend. *Id.* He reported feeling increased guilt, poor sleep, not being able to sit still, depression, and anger on a daily basis. *Id.* His current medications were Celexa and Depakote. *Id.* Plaintiff was diagnosed with mood disorder, not otherwise specified, obsessive-compulsive personality disorder traits, and rule-out intermittent explosive disorder. *Id.* He was assigned a current global assessment of functioning rating of 45, indicative of serious symptoms. *Id.* He was prescribed Depakote DR and referred to the Crisis Stabilization Unit for admission. *Id.* at 397.

On October 17, 2014, Plaintiff was referred by his primary physician for a diagnostic assessment due to his poor temper control. Tr. at 375. He reported no problems with depression or sadness, but he was anxious and shaky, had anger and sleep problems, and he was oppositional, impulsive and lost interest quickly. *Id.* at 378-379. He reported no psychosis, no substance abuse, and no traumatic stress. *Id.* His current medications were Celexa and Prilosec. *Id.* at 376. Plaintiff did not report having any suicidal or homicidal ideations. *Id.* at 380. The accompanying mental status examination indicated that Plaintiff presented as well-groomed, with an average demeanor, eye contact, and activity, clear speech, no delusional thought content, no aggressive thought content or hallucinations, a full affect with an anxious and angry mood, average attention/concentration, and poor insight and judgment. *Id.* at 380-381. He was described as motivated, but a noted obstacle to his recovery was his anger. *Id.* at 382. He was diagnosed with intermittent explosive disorder, with a rule out of attention deficit hyperactivity disorder and bipolar disorder. *Id.* at 382.

Plaintiff thereafter self-referred and was admitted to Turning Point Crisis Stabilization Unit on October 20, 2014 for his increasing anger, poor sleep and numerous stressors. Tr. at 393. On that date, the Licensed Professional Counselor noted that Plaintiff reported that he destroyed objects,

-3-

such as his sink and cell phone, and he had trouble keeping jobs due to his anger and resulting actions. *Id*. at 387. Plaintiff was discharged on October 24, 2014 and reported feeling better. *Id*. at 394. He was diagnosed with mood disorder and intermittent explosive order and his GAF was assessed at 58, indicative of moderate symptoms. *Id.* at 393. He was to continue with his Depakote prescription. *Id*. at 392.

On January 8, 2015, Dr. Tangeman, Ph.D. reviewed the file and completed a psychiatric review technique form and mental residual functional capacity ("MRFC") assessment for the agency. Tr. at 96. He reviewed Plaintiff's mental health impairments under Listing 12.04 for affective disorders and Listing 12.08 for personality disorders and he opined that Plaintiff's mental health impairments did not satisfy either Listing as Plaintiff's impairments mildly restricted his daily living activities and caused moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. *Id*. He further opined that Plaintiff was markedly limited in interacting appropriately with the general public and Plaintiff was moderately limited in working in coordination with others or in proximity to them without being distracted by them and in accepting instructions and responding appropriately to criticism from supervisors. *Id*. at 100. Dr. Tangeman opined that Plaintiff could relate appropriately as needed in everyday circumstances and he could relate on a superficial level with minimal public contact. *Id.* at 101. He further opined that Plaintiff would have significant difficulty working around others. *Id*. at 100.

On June 15, 2015, Dr. Lakhani performed a physical examination of Plaintiff for the agency. Tr. at 531-533. Plaintiff informed Dr. Lakhani that he had anger problems and a mood disorder, and he explained that he exploded in anger once in awhile and punches a wall, and he had broken a sink. *Id.* at 532. He reported that he is on medications and Turning Point wanted him to adjust his medications. *Id.* Dr. Lakhani's impression included a finding that Plaintiff had anger and mood disorder and his medications needed adjusted. *Id*. at 533. He indicated in his medical source statement that based upon his objective findings, Plaintiff was alert and oriented, and his concentration, hearing and speech were normal. *Id*.

-4-

On September 19, 2015, police brought Plaintiff to the emergency room where he reported that he had lost his temper, got into a verbal and almost a physical altercation with his girlfriend, broke a door and window, and threatened his girlfriend. Tr. at 540. He reported feeling increasing depression and anger. *Id*. Plaintiff was admitted to the hospital to stabilize him and to rule out organic factors. *Id*. His GAF upon admission was a 15, indicative of either some danger of hurting self or others, occasionally failing to maintain minimal personal hygiene, or gross impairment in communication. *Id.* On September 22, 2015, after he was put on Remeron and Trileptal and engaged in therapy, Plaintiff's mood improved and he was discharged from the hospital with a GAF of 40, indicative of some impairment in reality testing or communication, or major impairment in several areas. *Id*. at 540-541. Plaintiff was diagnosed with recurrent major depression and intermittent explosive disorder. *Id*. at 540. He denied suicidal or homicidal thoughts, he had no hallucinations, and his memory was intact. *Id.* Plaintiff requested to go to Turning Point for step-down services so that he could clear his head and work through some medication side effects. *Id.*

On September 30, 2015, Dr. Goldsmith, Ph.D., conducted a psychiatric review technique and MRFC assessment for the agency. Tr. at 130-136. He reviewed Plaintiff's mental impairments under Listing 12.04 for affective disorders and Listing 12.08 for personality disorders and he concluded that Plaintiff's mental impairments did not satisfy either Listing. *Id*. at 130. He opined that Plaintiff's mental impairments caused mild restrictions in his daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. *Id*. He further opined that Plaintiff was moderately limited in dealing with the general public, in getting along with co-workers and peers without distracting them or exhibiting behavioral extremes, and in accepting instructions and responding appropriately to criticism from supervisors. *Id*. at 134-135. Dr. Goldsmith opined that Plaintiff was limited to occasional and superficial interpersonal contact. *Id*. at 135. He explained that Plaintiff could relate appropriately as needed in everyday circumstances and he could relate on a superficial level with minimal public contact. *Id.*

December 30, 2015 notes from an initial psychiatric evaluation at Turning Point show that Plaintiff was diagnosed with severe mixed bipolar disorder, without psychotic features, and intermittent explosive disorder. Tr. at 785-788. On June 14, 2016, Plaintiff was discharged from

-5-

treatment because he did not return after his December 30, 2015 evaluation. *Id*. at 783.

On August 30, 2016, Plaintiff presented to the emergency room complaining of head pain after he was bitten on the chest and hit in the back of the head and on his lower left leg with a lead pipe. Tr. at 666. A CT of the brain was normal and he had a hematoma on his head. *Id*. at 667-668. A CT of the cervical spine showed no evidence of fracture or dislocation. *Id.* at 672. An x-ray of the left tibia showed no abnormality. *Id.* Plaintiff was given medication and his symptoms improved. *Id*. at 669. He was diagnosed with contusions of the scalp and left leg. *Id*.

November 21, 2016 notes from Licensed Social Worker Marucci at Turning Point show that Plaintiff presented to her after getting out of jail on October 31, 2016. Tr. at 766. She indicated that Plaintiff had been without his psychiatric medications since getting out of jail for hitting his girlfriend's child and he reported that he had problems controlling his impulses. *Id*. at 766, 769. He indicated that he was highly anxious and ready to "pop off." *Id*. at 769. Ms. Marucci noted that Plaintiff had a high degree of motivation and he related openly, but he had limited impairment in social functioning. *Id.* Upon examination, she made normal findings as to Plaintiff's grooming, and in his levels of hostility, withdrawal, and agitation. *Id.* at 776-777. She also noted that Plaintiff had normal thought content, thought processes, and perception, but she indicated "yes" as to the areas of self abuse and aggressiveness, and she indicated "moderate" as to homicidal intent. *Id.* at 777-778. Ms. Marucci found normal mood and affect, normal behavior, and normal cognition findings. *Id.* at 779-781. She further noted that Plaintiff was aware of his impulse control and anger issues and he used good judgment by seeking psychiatric care. *Id*. at 781. She concluded that he was not a risk to himself, but was a moderate risk to others. *Id.* at 774. In explaining this conclusion, Ms. Marucci indicated that Plaintiff reported that he was never suicidal. *Id*. She found that he had intermittent explosive disorder and struggled with his impulse to harm others. *Id.* She further indicated that Plaintiff was a moderate risk to others because he lacked impulse control and was a former semi-professional fighter with a long history of arrests for assaulting others and he was most recently released from jail for hitting his girlfriend's 8 year-old daughter. *Id.* She recommended that Plaintiff receive medication and counseling. *Id.* at 768.

### B. TESTIMONIAL EVIDENCE

At the ALJ hearing held on May 17, 2017, Plaintiff testified that he was single and had two children. Tr. at 66. He indicated that he did not have a current valid driver's license because it had been suspended for child support reasons. *Id.* He related that he had a ninth grade education and had a girlfriend who drove him to his appointments. *Id.* at 66-67.

Plaintiff reported that he had performed little jobs, like cutting grass, and he had applied for other jobs, but they refer back to his prior jobs and those employers would say negative things about him. Tr. at 67. When asked why he could not work, Plaintiff replied that he cannot work well with others and he had trouble keeping up with the pace of jobs and would become frustrated and angry, especially when supervisors would tell him that he had to pick up his pace. *Id.* at 68. He testified that he was taking his medications and he attended two anger management classes at Turning Point, but then the person running the class quit, so there were no more classes. *Id.* He indicated that he had some problems with his memory, but no problems with his concentration. *Id.* at 69-70.

When elaborating on his problems relating to others, Plaintiff explained that he gets antsy and frustrated around people. Tr. at 70. He found it difficult to explain, but testified that he was afraid that someone was going to say something wrong to him, approach him in a wrong way, or he was going to get angry. *Id.* He indicated that he stayed home most times and even goes to the grocery store at night because he does not want to be around people. *Id.* He stated that he and his girlfriend can have friends over, but he cannot deal with the public or new people or new things as he feared going to jail, which has happened in the past. *Id.* at 73-74. Plaintiff explained that the emergency room visit regarding the lead pipe resulted from his anger and in September of 2015 when he was admitted to the hospital, it was because he lost his temper and broke a door. *Id.* He also discussed a 2009 incident where he went to the emergency room after he punched a car hood with his fist. *Id.* He related that the last time he acted out physically or aggressively due to his anger was the past weekend when he was in his garage trying to get his lawnmower out and a couple of objects fell on his head and he threw those objects, which included an antique can, and it went through a window. *Id.* at 74. He also stated that he went to jail in December of 2014 after he spanked his niece on the rear-end, but she told the school that he slapped her in the face as she had

a handprint on her face after she got into a fight at school. *Id.* He also testified that he went to jail in 2008 after he got into a fight with two police officers, and he went to jail in 2013 after the police were called when he fought with a customer at a shop where he was working. *Id.* at 74-75.

Plaintiff further testified that when he did construction work in the past, he would ask if he could perform the work when the customer was not there or in another part of the house because he did not like being around people or being criticized if he was not doing something right. Tr. at 75. He explained that he knows it is the customer's house and if he did do something wrong, he would have no problem returning to fix it, but he wanted to work without being watched. *Id.*

The VE then testified. Tr. at 76. The ALJ asked her to assume a hypothetical individual with Plaintiff's age, education and work experience, who could perform light work with frequent climbing of ramps and stairs, never climbing ladders, ropes or scaffolding, frequent balancing and crawling, occasional exposure to unprotected heights, working with mechanical parts, and occasional exposure to humidity and wetness, and temperature extremes. *Id.* at 78. The ALJ also added mental limitations of simple, routine tasks, frequent ability to respond appropriately to co-workers, no interaction with the public, and judgment limited to simple, work-related decisions. *Id.* When asked if this hypothetical person could perform Plaintiff's past relevant work, the VE responded that such a person could not perform Plaintiff's past relevant work, but he could perform other jobs existing in significant numbers in the national economy, such as a cleaner, a folder, or a sorter. *Id.* at 79.

The ALJ modified the hypothetical individual, assuming the same limitations as the first hypothetical individual, but with a sedentary exertional level, occasional climbing of ramps and stairs, never climbing ladders, ropes and scaffolds, frequent balancing and crawling, and the same environmental limitations except the addition of occasional exposure to dust, odors, fumes, and pulmonary irritants. Tr. at 79. The ALJ added mental limitations of: simple, routine, repetitive tasks; judgment limited to simple/work-related decisions; occasional appropriate response to co-workers; occasional and superficial contact with co-workers, meaning no tasks involving arbitration, negotiation, directing the work of others, persuading others, or being responsible for the health and safety of others; no contact with the public, and judgment limited to simple, work-related decisions.

-8-

*Id*. at 80. The VE responded that such a hypothetical person could perform a significant number of jobs existing in the economy, including the jobs of assembler, final assembler, and sorter. *Id.*

The VE responded that no jobs would be available for a third hypothetical individual that the ALJ presented who would be off-task more than 15% of an 8-hour workday or absent more than 3 days per month. Tr. at 81.

When the ALJ presented a fourth hypothetical individual who had the same limitations as the second individual, but who also had no contact with co-workers, the VE responded that no jobs would be available for this hypothetical individual. Tr. at 81-82.

Plaintiff's attorney asked the VE if jobs would be available if the ALJ's last hypothetical individual was modifying to change the no contact with co-workers restriction to occasional contact with co-workers but the individual would have outbursts that would involve verbally accosting a co-worker or destroying property by throwing/slamming/'breaking it with his hand. Tr. at 82. The VE testified that the jobs identified would not be available for the hypothetical person. *Id*. He also indicated that no jobs would be available for such an hypothetical individual. *Id.*

### III.     **RELEVANT PORTIONS OF ALJ'S DECISION**

On June 16, 2017, the ALJ issued a decision finding that Plaintiff had not engaged in substantial gainful activity since June 30, 2014, the alleged onset date, and he found that since that date, Plaintiff had the severe impairments of: angina pectoris, ischemic heart disease-status post multiple stent placement surgeries; morbid obesity; degenerative disc disease of the lumbar spine; conduct disorder/intermittent explosive disorder/impulse control disorder; and depression/bipolar disorder. Tr. at 13-14. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1 and he specifically reviewed Listings 12.04 and 12.08. *Id.* at 14. After considering the record, the ALJ found that Plaintiff had the RFC to perform sedentary work with the following limitations: frequently lifting/carrying less than 10 pounds; occasionally lifting/carrying up to 10 pounds; sitting for up to 6 hours per 8-hour workday; standing/walking up to 2 hours per 8-hour workday; pushing/pulling the same as the lifting/carrying limitations; occasional climbing of stairs and ramps; never climbing ladders, ropes or scaffolds;

frequently balancing; occasional crawling; never being exposed to unprotected heights or moving mechanical parts; simple, routine, and repetitive tasks; occasional and superficial interaction with co-workers, with superficial defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others; no contact with the public; and limited to simple work-related decisions. *I*d. at 16.

Based upon Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ determined that Plaintiff could not perform any past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as assembler, final assembler, or a sorter. Tr. at 20. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB or SSI. *Id.* at 21.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## **V.    STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, the Court defers to the ALJ's decision if its is supported by substantial evidence, " even if substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009), quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## **VI.    LAW AND ANALYSIS–LISTING 12.08 AND MENTAL RFC**

Plaintiff first asserts that substantial evidence does not support the ALJ's determination that his mental impairments did not meet the "paragraph B" criteria of Listing 12.08 because his ability to interact with others was extremely limited not markedly limited, as found by the ALJ. ECF Dkt. #11 at 10-15. He also contends that substantial evidence does not support the ALJ's mental RFC for him because the ALJ found that he could have no contact with the general public and occasional

-11-

and superficial interaction with co-workers, which he defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. For the following reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertions.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 416.1520. In the third step of the analysis to determine a claimant's entitlement to DIB, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order to meet a listed impairment, the claimant must show that his impairment meets all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 12.08 is entitled "Personality and impulse-control disorders" and states the following:

12.08 Personality and impulse-control disorders (see 12.00B7), satisfied by A and B:

    A.    Medical documentation of a pervasive pattern of one or more of the following:

        1.    Distrust and suspiciousness of others;
        2.    Detachment from social relationships;
        3.    Disregard for and violation of the rights of others;
        4.    Instability of interpersonal relationships;
        5.    Excessive emotionality and attention seeking;
        6.    Feelings of inadequacy;
        7.    Excessive need to be taken care of;
        8.    Preoccupation with perfectionism and orderliness; or
        9.    Recurrent, impulsive, aggressive behavioral outbursts.

    AND

    B.    Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

> > 1. Understand, remember, or apply information (see 12.00E1).
> > 2. Interact with others (see 12.00E2).
> > 3. Concentrate, persist, or maintain pace (see 12.00E3).
> > 4. Adapt or manage oneself (see 12.00E4).

Listing 12.08. Listing 12.00, the introductory paragraph to the mental disorder Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1, states in relevant part that:

> 2. Listings 12.07, 12.08, 12.10, 12.11, and 12.13 have two paragraphs, designated A and B; your mental disorder must satisfy the requirements of both paragraphs A and B. Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing 12.05 has two paragraphs that are unique to that listing (see 12.00A3); your mental disorder must satisfy the requirements of either paragraph A or paragraph B.
>
> > a. Paragraph A of each listing (except 12.05) includes the medical criteria that must be present in your medical evidence.
> >
> > b. Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05.)

Listing 12.00 of 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, in order for Plaintiff to meet Listing 12.08, he must meet the criteria of both Paragraph A and Paragraph B of that Listing.

In this case, Plaintiff asserts that the ALJ erred by finding that his limitation in interacting with others was only marked and not extreme, as Paragraph B requires, in order to meet Listing 12.08. ECF Dkt. #11 at 13-14. He sets forth the definitions of extreme, marked, and moderate limitations as defined in Listing 12.00F2(c), (d), and (e). *Id.*, quoting Listing 12.00F2(c), (d), (e). Plaintiff correctly states that Listing 12.00F2 defines an extreme limitation as, "You are not able to function in this area independently, appropriately, effectively, and on a sustained basis." Listing

-13-

12.00F2(e). A marked limitation is defined as "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." Listing 12.00F2(d). A moderate limitation is defined as "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." Listing 12.00F2(c). Plaintiff asserts that his difficulty dealing with his anger qualifies as extreme and he cites as support his history of arrests, convictions, jail time, property damage, injuries, and destructive behavior due to his anger as evidence that he has an extreme limitation in interacting with others. ECF Dkt. #11 at 14.

The undersigned recommends that the Court find that the ALJ applied the proper legal standards at Step Three and substantial evidence supports his determination that Plaintiff's interaction with others was markedly and not extremely limited. The ALJ specifically reviewed Listing 12.08 and the Paragraph B criteria in determining whether Plaintiff's mental impairments resulted in at least one extreme or two marked limitations in the four broad areas of functioning. Tr. at 14. He cited and quoted the relevant regulations and the definitions of a marked limitation and an extreme limitation. *Id*. In supporting his finding for a marked limitation for Plaintiff in interacting with others, the ALJ identified Plaintiff's diagnoses of conduct disorder/intermittent explosive disorder/impulse control disorder, and his depression/bipolar disorder. *Id*. at 18. He acknowledged Plaintiff's history of time in jail, injuries and property damage, and arrests and fights with police and individuals, including a prior customer at work. *Id*. at 15-16.

However, the ALJ pointed to the absence of medical opinions in the record supporting an extreme limitation, as the only opinions in the record were those of the agency reviewing psychologists, whom he noted were experts in the field of social security disability medical issue evaluations. Tr. at 14, 18-19. The ALJ indicated that these medical experts found that Plaintiff was only moderately limited in interacting with the others, and one opined that Plaintiff was markedly limited in interacting with the general public. *Id*. at 14-16, 19, 96-100, 130-136. The ALJ limited Plaintiff to occasional and superficial interaction with co-workers, and to no contact with the general public. *Id*. at 16, 19. The ALJ noted that Plaintiff had a limited treatment history with only a few counseling sessions and no psychiatric hospitalizations since 2015, when he was hospitalized briefly and discharged as significantly improved after therapy and medication. *Id.* at 19. The ALJ also

-14-

referred to Plaintiff's reports to medical providers of primarily mild symptoms when he did participate in counseling, and he noted that Plaintiff's providers indicated mild observations and findings in their mental status examinations. *Id.*

The undersigned notes that the proper standard of review is whether substantial evidence supports the ALJ's determination and even if substantial evidence exists to support a finding to the contrary, this Court must defer to the ALJ's decision if substantial evidence supports it. *Blakely*, 581 F.3d at 406. The ALJ is correct that no medical source opined that Plaintiff had extreme limitations in interacting with others. The only opinions concerning the B criteria for Listing 12.08 came from state agency psychologists and the ALJ attributed significant weight to these opinions. An ALJ can attribute significant weight to the opinions of a non-examining state agency medical expert in some circumstances because non-examining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. The undersigned recommends that the Court find that the ALJ in this case properly attributed significant weight to the opinions of the agency reviewing psychologists as they were the only opinions in the file and they were based upon a review of the record. On January 8, 2015, Dr. Tangeman reviewed Plaintiff's mental impairments under Listings 12.04 and 12.08 and opined that Plaintiff had moderate difficulties in maintaining social functioning, but he was markedly limited in interacting appropriately with the general public. Tr. at 100. In support of his opinion, Dr. Tangeman specifically considered Plaintiff's diagnoses, his history relating to his anger, fights, and resulting injuries, his report that he was fired from his last job due to his anger problems, his emergency room visits due to his anger and injuries resulting therefrom, and his counseling sessions at Turning Point. Tr. at 94-95. On September 30, 2015, Dr. Goldsmith, the other state agency psychologist, reviewed Plaintiff's records and also opined that Plaintiff had only moderate difficulties in maintaining social functioning, in responding appropriately to supervisors and to get along with co-workers. *Id.* at 131, 135. He differed with Dr. Tangeman's opinion as to interacting with the general public, finding that Plaintiff was only moderately limited in doing so. *Id.* at 135. Both Dr. Tangeman and Dr. Goldsmith found that Plaintiff could relate appropriately in everyday circumstances and could relate

on a superficial level in a work setting with minimal public contact. *Id*. at 95, 135. The ALJ actually found Plaintiff more limited than the agency reviewing sources, indicating that Plaintiff was markedly limited in interacting with others, as he attributed weight to Plaintiff's testimony about his problems with impulse control and anger issues, including fighting with police officers and a customer at a past job. *Id*. at 15.

In addition, the ALJ correctly relied upon and found that Plaintiff did not have ongoing treatment for his mental health impairments. Tr. at 18. The record shows that Plaintiff had an initial psychiatric assessment in September of 2014, a diagnostic assessment in October of 2014 followed by a three-day admission to Turning Point's Crisis Stabilization Unit, but then no other records relating to his mental health exist until September of 2015, when he was hospitalized for psychiatric issues after fighting with his girlfriend. *Id*. at 395-398, 375, 785-788. Plaintiff underwent another psychiatric evaluation at Turning Point in December of 2015, but he was discharged from treatment in June of 2016 due to his failure to attend treatment since December of 2015. *Id*. at 782-787. Plaintiff then returned to Turning Point after he was released from jail in November of 2016. *Id*. at 766-781. However, further records submitted by Plaintiff of a new primary care physician show that his doctor, Dr. Vandevender, recommended that Plaintiff return to counseling and needed to make that appointment important as he was expressing concerns over his anger and anxiety. Tr. at 58. Dr. Vandevender noted upon her physical examination of Plaintiff for his knee pain that Plaintiff did not report a depressed or sad mood, he was alert, talkative, he was seen with his girlfriend, and he was not suicidal or homicidal. *Id*.

The same evidence and analysis supports the ALJ's mental RFC for Plaintiff, in which he limited Plaintiff's mental RFC to include no contact with the general public and occasional and superficial contact with co-workers, which the ALJ defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. Tr. at 16. A claimant's RFC is an assessment of the most that a claimant "can still do despite his limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3). The claimant bears the responsibility of

providing the evidence used to make a RFC finding. 20 C.F.R. §§ 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.*

The ALJ in this case reviewed the limited medical evidence concerning Plaintiff's mental impairments, relied upon the mental RFC determinations of the agency reviewing psychologists who provided the only evaluations in the record, and he again noted Plaintiff's limited and inconsistent treatment, symptom improvement when he was in treatment, and he discounted Plaintiff's credibility concerning the disabling nature of his symptoms, since Plaintiff reported relatively mild clinical findings when he did attend treatment and improvement in his symptoms was noted when he did attend treatment. Tr. at 19.

Based upon the standard of review, and upon review of the ALJ's decision, the undersigned recommends that the Court find that the ALJ applied the proper legal standards concerning the determination of Plaintiff's mental RFC and substantial evidence supports his mental RFC for Plaintiff in interacting with others.

## VII. RECOMMENDATION AND CONCLUSION

For the above reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

Date: July 23, 2019
          */s/George J. Limbert*
          GEORGE J. LIMBERT
          UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).